ROBERT DAHLMANN, Plaintiff in Error, *vs.* FRANK GAU-
GENTE, Defendant in Error.

*Opinion filed February 19, 1909.*

1. INTOXICATION—*extent of intoxication necessary to render a
transaction invalid.* To render a transaction invalid because of
the intoxication of one of the parties thereto the intoxication must
have been such as to drown memory, reason and judgment.

2. SAME—*when deed made during grantor's intoxication will be
set aside.* A deed made in consideration of one dollar and support
for life will be set aside in equity, at the suit of the grantor, where
it appears that the grantee procured the execution of the deed after
he had contrived to get the grantor so intoxicated that he did not
know what he was doing when he made the deed.

WRIT OF ERROR to the Circuit Court of Cook county;
the Hon. CHARLES M. WALKER, Judge, presiding.

The original bill in this case was filed by plaintiff in er-
ror in the circuit court of Cook county July 30, 1906, and
subsequently, on May 6, 1907, an amended bill was filed.
It alleges, among other things, that Robert Dahlmann is
the owner, in fee simple, of a one-story-and-basement frame
dwelling, containing five rooms, known as 125 Gault court,
in Chicago, worth about $1000; that defendant in error,
Frank Gaugente, is a saloon-keeper at 68 Oak street, in
said city, and had often treated the said plaintiff in error
to intoxicating drinks and often requested him to deed the
aforesaid real estate; that on July 20, 1906, said Gaugente
treated the plaintiff in error to intoxicating liquors of such
a nature as to cause him to be unable to think or know
what he was doing, and while in that condition he was
taken by defendant in error to the office of an attorney and
executed a deed conveying said property to Gaugente; that
at the time said property was so conveyed plaintiff in error
was under the control and in the power of Gaugente, was
unduly and improperly influenced by him and was sick and
under the influence of liquors and drugs, which caused such

mental weakness that he was unable to know what he was doing when he executed said conveyance. The defendant in error answered, admitting that the deed was executed July 20, 1906, at the office of said lawyer, but denied that he ever offered Dahlmann drinks in his saloon or urged him to drink, or that he ever proposed to said plaintiff in error that he deed the property, but stated that the proposition to convey said real estate was first made to defendant in error and urged upon him by the said plaintiff in error. A consideration of one dollar was named in the deed, with the further consideration that said Frank Gaugente "agrees to pay any taxes now due or to become due against said property, and agrees, as a part of the consideration, to give the said grantor, Robert Dahlmann, a home within the said premises, together with board, during the life of said Robert Dahlmann, free of any expense to him, which terminates at the death of said grantor." The case was referred to a master in chancery, who, after taking the evidence, reported, among other things, that at the time the deed in question was signed plaintiff in error was so feeble in mind, as the result of excessive drinking, that he was unable to understand the nature of the transaction in which he was engaged, and the master recommended that said deed of July 20, 1906, be declared null and void. After a hearing on exceptions to this report the chancellor sustained objections thereto and dismissed the bill for want of equity. To review that decree this writ of error is sued out.

P. R. BOYLAN, for plaintiff in error.

BERNARD P. BARASA, and AARON HEIMS, for defendant in error.

Per CURIAM: Plaintiff in error testified that he was a single man, fifty-three years of age; that for years he had been engaged in whitewashing, plastering and general job-

bing business; that he had been the owner of said property for about two years, it having been left to a brother and himself by their mother; that he had bought out his brother's share; that his brother died June 22, 1906, very suddenly, dropping over dead in plaintiff in error's arms; that he had been acquainted with defendant in error only about six months prior to the execution of said conveyance; that the back door of said Gaugente's saloon was very close to plaintiff in error's yard and Gaugente frequently called him over and asked him to drink; that he did no work from the time of his brother's death until after this deed was executed; that he did not remember what happened on said July 20, 1906, as he was intoxicated and stupefied by drink; that he had a very indistinct recollection of being down in a lawyer's office and a dollar being paid him, but had no recollection of having on that date, or at any other time, any conversation about his property with defendant in error; that he could not remember returning from the lawyer's office to his home, and did not know until several days after the conveyance was executed that defendant in error claimed to own the property; that he first learned of it by people telling him they had seen a statement of the conveyance in the papers; that he knew he had done something foolish but did not know what it was; that he was in defendant in error's saloon on said July 20, 1906. Three women and two men, neighbors of his, who had known him from twenty to thirty years, testified that they noticed after his brother's death that he was a changed man; that he was drinking to excess during all the time from the date of said death until after said conveyance was executed; that he did not do any work and that they did not believe he was in a condition of mind to do any business at the time the deed was executed. Most of them testified that between the date of his brother's death and the date of this conveyance they saw him at various times in the saloon of defendant in error. One of the women went over to get

him to do some work and found him intoxicated. She testified that she talked to him in the presence of defendant in error. One of these witnesses had a drink with plaintiff in error in that saloon and saw him there the day the deed was executed, with empty liquor glasses before him. This witness testified that Dahlmann was under the influence of liquor that day. Another of these witnesses testified that the plaintiff in error was in Gaugente's saloon that day. A brother of plaintiff in error testified that he had seen him a few times between the date of the other brother's death and the date when the deed was executed, and that he did not think from what he saw that plaintiff in error was in condition to do business.

Defendant in error testified that Dahlmann first made the proposition to trade the property, saying that he (Dahlmann) did not want to die like his brother, without any of his friends about him; that this proposition was so made several times before the deed was executed and on the date the deed was executed, before they went to the lawyer's office; that Dahlmann was not in the saloon during the month before said deed was executed; that before that he came into the saloon three or four times but that he never drank any liquor there, though he sometimes took some away in a pail; that plaintiff in error stated as his reason for wanting to deed the property to Gaugente for his room and board for life, that he knew he would be treated better by said defendant in error than by his (Dahlmann's) brother; that at the solicitation of plaintiff in error he took said Dahlmann down-town with him the day the deed was executed; that an Italian friend of defendant in error, one Philip Mino, accompanied them; that neither Gaugente nor Dahlmann knew any lawyer; that the latter insisted that he wanted an American lawyer, and Mino thereupon suggested they go down to the office of the lawyer in question, who was a colored man. It appears further that the lawyer who drew the deed was paid by Mino ten dollars for his

services. It was also testified to, that the deed was first drawn with only a dollar consideration, but was destroyed and another drawn with the provision for board and room, as above set forth. Both this lawyer and his partner testified that they thought plaintiff in error was sober and understood fully what he was doing; that he seemed to be the party who was urging the trade. They both testified that all of them went out with Dahlmann and had a drink in a saloon before the deed was finally executed. The testimony for the defendant in error shows that when they reached the office the lawyer was out and they waited for him several hours. The lawyer's partner testified that notices as to the change of ownership were at this time drawn up, to be served on the tenant who occupied the upper floor of the premises. Mino, who testified that he was a steamship agent, stated that he thought the plaintiff in error was sober on the day in question. Two Italian barbers testified that they heard plaintiff in error say that he had deeded the property to the defendant in error because he thought Gaugente would treat him better than his brother would. An Italian plumber also testified, in substance, to the same fact.

To render a transaction invalid on account of the intoxication of one of the parties thereto he must be so intoxicated as not to know what he is doing,—the intoxication must be of such a nature as to drown memory, reason and judgment. (*Bates* v. *Ball*, 72 Ill. 108; *Martin* v. *Harsh*, 231 id. 384.) The rule in this State seems to be the rule in most jurisdictions. Formerly, if the intoxication was voluntary and not procured by the other party to the contract, the intoxicated person was without remedy, but this old rule has gradually been departed from out of better conceptions of equity. As was said in *Crane* v. *Conklin*, 1 N. J. Eq. 346: "Instead of saying to the wretched victim of intemperance that the avenues not only of law but of equity were closed to him and that he was to be left as an outlaw in society, a prey to the cunning and cupidity of

the spoiler, it extended to him the just protection of the court, not for the purpose of setting aside his contract on the ground of his infirmity or crime, but for the purpose of looking into his transactions to see whether any advantage had been taken of his unhappy situation. It would not favor ebriety, but at the same time would not permit it to be taken advantage of with impunity. The good sense of this principle has commended itself to every court, and especially to the courts of equity."

Where the intoxication of one party has been induced or brought about by the other party to the alleged contract or deed, the authorities seem to be uniform that equity will set aside the contract, especially if any unfair or improper advantage has been taken in the transaction. In *White* v. *Cox*, 3 Haywood, 79, the court held that if any advantage be taken of a man when drunk, or if he be brought into that situation by the contrivance or management of the person who obtains the contract, the contract thus gained is fraudulent and cannot be enforced. In *Lyon* v. *Phillips*, 106 Pa. St. 57, it was held that the fact that the owner of a note had caused the maker to drink intoxicating liquor and sign the note while in a drunken state constituted such a fraud as to make the note void or voidable. *O'Conner* v. *Rempt*, 29 N. J. Eq. 156, is a case as to facts much like the one now under consideration. A single man about sixty years of age, by trade a carriage painter, owned property worth about $4000 and conveyed the same for the actual consideration of one dollar and for his necessary support "during his natural life, medical attendance when required and the payment of funeral expenses in case of death." The evidence there showed that the man had been drinking to excess and that he was only very slightly acquainted with the persons to whom he had given the deeds of his property. They testified that he was sober at the time he acknowledged the paper, and the man who took the acknowledgment testified to the same thing. The court con-

cluded that the evidence showed that the execution of the deed was procured by management and contrivance and that it was the clear duty of the court to set it aside. This court in *Bates* v. *Ball, supra,* stated, in effect, that if any person connected with the transaction had aided in procuring the intoxication of the person who executed the contract, such fact would be taken into consideration. We also held in *Murray* v. *Carlin,* 67 Ill. 286, that where it appears that one of the parties to a trade was overreached while in such a mental condition, from the use of intoxicating spirits, as made him an easy victim, evidence showing this condition is a fair question to be presented to the jury. To the same effect are *Birdsong* v. *Birdsong,* 39 Tenn. 289; *Chicago, Rock Island and Pacific Railway Co.* v. *Lewis,* 109 Ill. 120; *Cook* v. *Bagnell Timber Co.* 8 Am. & Eng. Ann. Cas. 251, and note. The following authorities all uphold the rule that if a person has been induced by the other party to the contract to drink intoxicating liquors so as to affect his judgment, such agreement may be rescinded in equity, especially if improper advantage has been thereby taken: Pomeroy on Specific Performance, sec. 184, note 3; 14 Cyc. 1105; 17 Am. & Eng. Ency. of Law, (2d ed.) 402; *Cooke* v. *Clayworth,* 18 Ves. Jr. 12, and note; *Pittenger's Admrs.* v. *Pittenger,* 3 N. J. Eq. 157; *Cameron-Barkley Co.* v. *Thornton Co.* 107 Am. St. Rep. (N. C.) 532, and note; *Wright* v. *Walker,* 54 L. R. A. (Ala.) 440, and note. The notes to these last two cases present a very exhaustive review of the authorities on this question.

No reason is advanced, and we can conceive of none, why plaintiff in error should have been desirous of making the arrangement provided in the deed for his board and support by defendant in error. They were not of the same nationality. They had been only slightly acquainted for a few months. The record does not show that they had anything in common or any close association, except that the plaintiff in error had been drinking in defendant in error's

saloon. The making of the deed was one of the most important acts in plaintiff in error's life and one to which a man having his senses would have given the most serious consideration. Dahlmann, apparently, had not talked with his surviving brother or any of his friends about the transaction before executing the deed. The evidence shows that previous to his brother's death he had been a man of good habits and in fair bodily health, with the exception of one defective eye. There is no evidence tending to show in the slightest degree that he had ever had any trouble with his brother now living, except the testimony of Gaugente and several of his Italian friends that the plaintiff in error had stated to them that Gaugente would treat him better than his brother would. Why should plaintiff in error, an industrious, hard-working man, only fifty-three years of age, desire to deed his property to his brother or any of his most intimate friends,—least of all to defendant in error, a comparative stranger? The statement of Gaugente that plaintiff in error had not been in his saloon for a month previous to the execution of this deed is contradicted by at least a half dozen witnesses who stand on this record unimpeached. The testimony of the witnesses as to the intoxication of plaintiff in error on the day the deed was executed is conflicting, but the story as told by defendant in error and the witnesses in his behalf as to how the deed came to be executed is improbable in many of its features. That plaintiff in error should have executed the deed as testified to by these witnesses seems unreasonable. All the facts and circumstances surrounding this transaction impress us with the conviction that Gaugente procured the intoxication of Dahlmann for the purpose of securing the execution of this deed, and that he took Dahlmann to the lawyer's office while in that condition and by the management and contrivance of himself and his friends fraudulently obtained the execution of said deed.

All the testimony was taken before the master in chancery, none being heard by the chancellor in the trial court. The chancellor, therefore, was obliged to judge of the weight to be given this testimony by a perusal of the transcript now before this court. We think the decree should have sustained the master's report.

The decree of the circuit court will be reversed and the cause remanded to that court, with directions to enter a decree declaring said deed of conveyance of July 20, 1906, from plaintiff in error to defendant in error null and void.

*Reversed and remanded, with directions.*