(No. 20480.—

PAUL DIDIUK, Appellant, *vs.* ANNA KARPUK *et al.*
Appellees.

*Opinion filed April 23, 1932.*

CLARENCE W. HEYL, and L. E. SUTHERLAND, for appellant.

GEORGE W. HUNT, and J. EDWARD RADLEY, for appellees.

Mr. COMMISSIONER EDMUNDS reported this opinion:

Paul Didiuk filed a bill in the circuit court of Peoria county to set aside a deed made by him by which he conveyed to Anna Karpuk a half interest in certain lots in the city of Peoria. Anna Karpuk, and Andrew, her husband, filed an answer denying the material allegations of the bill and alleging that Anna had a half interest in the property and praying that the premises be partitioned and that their answer stand as a cross-bill. The cause was re-

ferred to a master, who recommended that the bill be dismissed for want of equity and that the premises be partitioned. Objections to the master's report were overruled and a decree was entered dismissing the bill and appointing commissioners for partition. From this decree Didiuk has appealed.

The master's findings of fact are not abstracted and the decree makes no special findings with reference to the points upon which the evidence is in conflict.

Appellant testified through an interpreter that he operated a grocery store and meat market in the brick building which stood upon the front part of the lots in question and that in the rear of the store and upon the lots there was a frame house, which he rented; that about a week after January, 1929, Anna Karpuk told witness that she and her husband, Andrew, had money to invest; that they would move out of the house where they lived and live in witness' house; that they would sell their house and put the money received therefor in witness' business; that they would also put into the business what money they then had on hand; that they showed witness a bank book but did not tell him how much money they had; that witness refused to accept the proposition; that a similar proposition was made to witness about three weeks later and he refused it; that in the latter part of March Anna called up witness and he went to her house; that she gave him wine and again made the proposition, which he refused; that the next day her husband stayed at home and he and Anna got witness drunk; that witness spent most of the next two or three days at Anna's house, she and Andrew keeping him drunk during all that time; that on the morning of April 3 Andrew came for witness and took him to Anna's house, where they stayed about two hours and had five or six drinks, after which witness drove them down-town in his car; that he took some papers with him, including the contract for the purchase of his property; that they went to a lawyer's

office; that witness then saw the lawyer for the first time and thinks his name is Wasson; that Anna and Andrew said that witness did not need to be afraid of them; that they would put $1000 into the business, and when they moved out of their house witness would get the rent until they sold it and then he would have the money; that he, Anna and Andrew were all to live in the house on witness' property and work together in the store and keep roomers in the rooms over the store; that witness was not to pay board or room rent and they were to take things from the store to live on; that the arrangement as to his board and room was to continue "all the time;" that the lawyer talked to him but witness could not make out all he said; that witness said he ought to have some kind of papers to show what he was getting, and Andrew said he did not need any; that he gave to the lawyer the papers that he had brought along; that he saw Wasson preparing some papers, although he did not know what they were; that witness and the others were in the office maybe half an hour; that he paid Wasson five dollars for drawing the papers and left them at Wasson's office; that Anna and Andrew moved into witness' house on April 16; that Paul Tomaczewsky had been a partner of witness in the grocery business, working there and receiving half the profits; that they paid Tomaczewsky $225 for his interest; that on the day Anna and Andrew moved in he asked them for the $1000 but was told they had only $115; that this $115, and $100 put in by witness, was used to pay Tomaczewsky; that all ate in the store building, including the boarders; that this continued for a month and a half, when Anna quit cooking and working in the store, and that Andrew then told witness he had him where he wanted him, threatening to "beat up" witness.

Sam Burlest testified through an interpreter that he talked with Anna Karpuk after she quit working at appellant's place, and she told witness that if appellant would not give her $800 she would "go to" a lawsuit with him;

that witness asked her why she did not work, and she said she did not want to work—she just wanted $800.

E. C. Albert, who had desk room in the suite occupied by Wasson, testified that he remembered the occasion when appellant, Anna and Andrew came to the office; that he knew Anna before that, having been at her house three times to collect a bill; that on the occasion in question they waited about half an hour, and that appellant was drunk and hardly able to talk. Simon Alloy testified that he met the three in Wasson's office or in the hallway of the building on April 3 and talked with appellant, and that appellant was drunk.

Anna Karpuk testified through an interpreter that she had known appellant for eight years; that her husband and appellant were in the grocery business together from 1921 to 1923; that she did not send for appellant on April 3, he having said the day before that he would come; that he came in his car; that neither she nor her husband gave him anything to drink and he was not drunk; that none of them had drunk any intoxicating liquor; that the day before, appellant had been at her house an hour and was not drunk; that he told her he wanted to give her the deed; that he did not want to leave anything to his family; that his family "did not put anything into it but she did;" that before the deed was made nothing was said about boarding appellant or cooking for him, nor was anything said about her husband and appellant going into the grocery business; that prior to making the deed nothing was said about having any money in the bank or selling the property belonging to witness and her husband and putting the proceeds thereof into the business; that the day the deed was drawn they went down-town in appellant's car; that he "walked fine;" that they first went to the office of attorney Hunt; that Hunt was away and at appellant's suggestion they went to Wasson's office; that witness did not see Alloy that day at all and that neither her husband nor

appellant talked to Alloy in the hallway that day; that in Wasson's office appellant said, "I want to give these people one-half interest in my property," and he pulled out a piece of paper and gave it to Wasson; that Wasson drew the deed and appellant signed it; that Wasson read it over to appellant, who said it was what he wanted; that Wasson told him he ought to deed the property so he would have control of it during his lifetime, and that appellant said: "Once I give I give; that I don't have to live with them and they don't have to live with me, and that I don't have to put in any hooks to it." Further testimony given by Anna, which it is unnecessary to detail, was to the effect that such dealings as there were with reference to buying out Tomaczewsky and acquiring a half interest in the business took place only after the deed was delivered and had nothing to do with the conveyance of the lots in the first instance. On cross-examination she testified that the first time she and appellant talked about having a deed made was in January, when he suggested that they go and make it, but she did not go because she "wasn't in any hurry;" that they never served appellant a drink at their house and he never drank anything there, and that she never had anything to drink there between January and the time the deed was made. The testimony of Andrew Karpuk was substantially the same as that given by Anna.

Andrew Bury testified that he had known appellant, Anna and Andrew for about three years; that he talked to appellant on January 27, 1929, about his conveying a portion of his property to Anna; that appellant told witness to tell Anna that he wanted to "please her," and that witness should tell her she should "make up" with appellant and be friends with him "the same as with other men;" that witness asked appellant how he expected her to be friendly after the deal six years before when he "kicked them out," and he said he knew he did wrong, and that was the reason he wanted to give them half of the property to become

good friends once more; that witness went to Anna and told her that appellant sent him, whereupon she said that appellant had "done her wrong" and she did not want to have anything to do with him, but that when witness told her she had a chance to get back what he took six years before she said to tell him he could come.

Irvine Wasson testified that he was a practicing attorney; that he had known appellant "for years;" that when appellant, Anna and Andrew came to his office on the occasion in question appellant said he wanted a deed made out to Anna; that witness asked why he did not make a will, and he said he wanted them to have the property now; that witness drew a deed and appellant signed it, leaving it with witness to record; that appellant was sober; that no interpreter was present and witness read the deed to him in English, asking him if he understood it, and that he said he did.

John Kuchmuk testified through an interpreter, for appellant on rebuttal, that he was at Anna's house in January and March, 1929; that he would go there something like once a month to drink whiskey; that he would stay there and drink for three or four days; that when he was there in January a man was sent and brought appellant there; that Anna and Andrew sent the man; that when witness got his pay the last of March he went to Anna's house to drink for three or four days; that either the second or third of April Andrew himself went and called appellant to the house; that appellant came in the morning and stayed a while and got drunk, and that while they were drinking Andrew showed him a bank book, saying that he had money in the bank. Testimony offered for the purpose of showing that Kuchmuk could not have been at Anna's house at the time in question because he was working as a railroad section hand was met by testimony to the effect that another man was working at the time under Kuchmuk's name.

E. C. Albert testified that he had been in Anna's house twice—once in February—and had seen intoxicating liquor served there. Alex Bokun and Sam Gurachko testified to having been served drinks there.

Appellant introduced in evidence an agreement dated June 1, 1923, between Andrew and appellant, whereby Andrew sold to appellant a one-half interest in a soft drink parlor business for a consideration of $1750, and which recited receipt by Andrew, through the Commercial National Bank of Peoria as escrow agent, of that amount. It was stipulated that appellant's premises were worth $12,000 and those of Anna and Andrew $2800, subject to a loan of $1000.

It is not claimed that any money was paid as consideration for appellant's deed. The contention of Anna and Andrew is that the owner of property may give it away if he desires, and as between the parties a voluntary conveyance, unaccompanied by fraud, oppression, over-reaching or unfair dealing, will not be set aside on the ground that there is no consideration for the deed. They contend, further, that the seal upon the deed imports a consideration for the making thereof, and in the absence of fraud the grantor will be bound though nothing was paid. They assert that there was a gift here, with which equity cannot interfere. Appellant contends, on the contrary, that the deed which he executed was not his free and voluntary act; that it was induced by Anna and Andrew while he was in a state of intoxication which they had brought about, and that therefore it should be set aside.

In many respects the circumstances here disclosed closely parallel those involved in *Dahlmann* v. *Gaugente,* 238 Ill. 224. That case was also one to set aside a deed on the ground that it was procured by the grantee after he had contrived to get the grantor intoxicated. The chancellor dismissed the bill for want of equity, but this court reversed the decree and remanded the cause, with directions to enter

a decree declaring the conveyance void. In the course of the opinion we pointed out that where the intoxication of one party has been induced or brought about by the other party to the alleged contract or deed the authorities seem to be uniform that equity will set aside the contract, especially if any unfair or improper advantage has been taken in the transaction. We there said: "No reason is advanced, and we can conceive of none, why plaintiff in error should have been desirous of making the arrangement provided in the deed for his board and support by defendant in error. * * * Why should plaintiff in error, an industrious, hard-working man, only fifty-three years of age, desire to deed his property to his brother or any of his most intimate friends—least of all to defendant in error, a comparative stranger? * * * The testimony of the witnesses as to the intoxication of plaintiff in error on the day the deed was executed is conflicting, but the story as told by defendant in error and the witnesses in his behalf as to how the deed came to be executed is improbable in many of its features. That plaintiff in error should have executed the deed as testified to by these witnesses seems unreasonable. All the facts and circumstances surrounding this transaction impress us with the conviction that Gaugente procured the intoxication of Dahlmann for the purpose of securing the execution of this deed, and that he took Dahlmann to the lawyer's office while in that condition and by the management and contrivance of himself and his friends fraudulently obtained the execution of said deed."

In the present case an attempt is made to supply a reason why appellant was desirous of making the deed of gift to Anna. It is said that he wanted her to have an undivided half interest in the property rather than to have it go to distant relatives. It is also suggested by certain testimony that appellant desired to right the wrong he did Andrew by "kicking him out" of a previous business as-

sociation some six years before. Taking into account the documentary evidence showing that at that time appellant paid Andrew $1750 for his interest in the soft drink business, the theory that the conveyance to Andrew's wife of property worth several thousand dollars was prompted by a desire to right an old wrong done to Andrew becomes unacceptable to a reasonable mind. As in the *Dahlmann case,* we cannot avoid being impressed by the improbable and unreasonable nature of the transaction as the grantee would explain it. That appellant should at different times over a period of several months be urging Anna to permit him to make the conveyance to her, with her refusing to accept it because she "wasn't in any hurry," is, in the light of all the circumstances disclosed, highly improbable. It is needless to prolong this opinion by any detailed analysis of the evidence. Why should appellant have desired to make a gift of a half interest in his property to a stranger in blood—the wife of another man? This record discloses no reasonable answer. It may be said here as appropriately as in the *Dahlmann case,* that "all the facts and circumstances surrounding this transaction" impress us with the conviction that Anna and Andrew procured the intoxication of appellant for the purpose of securing the execution of this deed, and that they induced him to go to the lawyer's office while in that condition and by their management and procurement fraudulently obtained the execution of the deed. The rules expressed in the *Dahlmann case* are applicable and decisive here.

It follows that the decree must be reversed and the cause remanded, with directions to enter a decree declaring the conveyance void.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Edmunds is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded, with directions.*

Subsequently, on petition for rehearing, the following additional opinion was filed:

Per CURIAM: The foregoing opinion was filed at the June, 1931, term of this court. At the October, 1931, term a petition for rehearing was allowed. Since that time we have re-examined the record, together with the briefs of the respective counsel. After so doing we still adhere to the belief that the conveyance was made in consideration of appellees' promise to support and care for appellant as long as he will live and that the promise was made by appellees with no intention of carrying it out. The transaction was a gross abuse of the confidence reposed in appellees and "is tainted throughout by a fraudulent intent, which ripened into a wicked consummation." (*Oard* v. *Oard,* 59 Ill. 46.) Where an agreement to care for and support the grantor is the consideration for a deed, the subsequent conduct of the grantee may warrant the presumption that the deed was secured with a fraudulent intent on the part of the grantee not to perform the condition of the contract. If there is a substantial failure or refusal to perform the agreement equity will set aside the deed. *DiRosa* v. *Sammarco,* 278 Ill. 46; *Luttrell* v. *Wyatt,* 305 id. 274.

The degree of intoxication of appellant at the time he executed the deed is not of controlling importance. If he was induced by fraudulent promises of support made to him on the day of its execution and upon a number of previous occasions, equity will set the deed aside whatever may have been his state of sobriety. However, we think the evidence clearly shows he was in a high state of intoxication throughout the day of April 3.

The decree will be reversed and the cause remanded, with directions to enter a decree setting aside the conveyance.

*Reversed and remanded, with directions.*