INDIANA BROADCASTING CORP., Defendant-Appellant,

v.

STAR STATIONS OF INDIANA, Plaintiff-Appellee.

No. 2–278A 46.

Court of Appeals of Indiana, Fourth District.

April 16, 1979.

William F. Welch, Daniel P. Byron, McHale, Cook & Welch, Indianapolis, for defendant-appellant.

C. B. Dutton, Alan H. Goldstein and Gary P. Price, Dutton, Kappes & Overman, Indianapolis, for plaintiff-appellee.

YOUNG, Judge.

Star Stations of Indiana, Inc. (Star) and Indiana Broadcasting Corporation (IBC) entered a transaction involving the sale of certain tangible and real property (Purchase Agreement) and the grant of certain easement rights (Grant of Easements and Rights). It is the grant of the easements from IBC to Star, and the construction and interpretation of certain language in the instrument containing the grant of such rights and easements, which forms the basis of this appeal.

By the terms of these agreements, IBC sold and assigned to Star its assets and Federal Communications Commission (FCC) licenses connected with the operation of two radio stations formerly designated WISH–AM and WISH–FM, Indianapolis, Indiana. Among such assets transferred were land, equipment and certain easements and rights connected with such operations. Pursuant to the Purchase Agreement, IBC conveyed to Star approximately one acre of land designated in the Purchase Agreement as Tract 1, and IBC retained for itself approximately thirty-nine (39) acres of land described as Tract 2 upon which was located a television tower approximately one thousand feet high and two radio transmission towers, each of which was approximately four hundred seventy feet high. IBC also sold to Star the two radio transmission towers located on Tract 2 and an AM radio sampling loop, FM antenna and transmission lines located on the one thousand foot television tower also located on Tract 2. IBC, however, retained ownership of the television tower.

Specifically, IBC granted Star an easement to locate equipment used in FM radio operations on the television tower owned by IBC. Contained within the document granting such rights was the following language, designated paragraphs 3(j) and 3(k) of the Grant of Easements and Rights.

3(j) The easements and rights hereby granted shall continue so long as necessary to the respective radio transmission operations of the Grantee and the televi-

sion broadcast transmission operations of the Grantor; provided, however, that in no event shall such easement or rights continue for a period exceeding forty (40) years from the date of this instrument, upon the termination of which period they shall automatically expire if not previously otherwise extinguished.

3(k) If Grantee at any time prior to the expiration of the easements and rights hereby granted ceases use of Tract 2 for the location of equipment or facilities directly involved in radio broadcast transmission purposes, the easements and rights hereby granted shall automatically terminate. If Grantee ceases use of Tract 1 for radio broadcast transmission purposes, Grantor shall thereupon have a first option or refusal to purchase Tract 1 at a fair market value, determined as provided in paragraph (1) below, within thirty (30) days after the decision of the appraisers.

In addition, Section 4 of the Grant of Easements and Rights contained the following language:

4. This instrument and the terms and conditions shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

The Purchase Agreement and the Grant of Easements and Rights were first drafted by IBC. These drafts were then forwarded to Star for review by it and its attorneys.

Following acquisition of the assets of WISH–AM and WISH–FM by Star, these stations were redesignated WIFE–AM and WIFE–FM, respectively. Each of these was regulated and controlled by the FCC pursuant to a separate license granted each station by the FCC. Because of improprieties in the operation of the station, Star was investigated by the FCC. Star was forced to surrender its licenses for WIFE–AM and WIFE–FM.[1] As a result Star could no longer utilize the call letters "WIFE", or broadcast on federally regulated radio frequencies.[2]

In early 1976, before the revocation of its FCC license, Star negotiated for the sale and transfer of its WIFE–AM assets. At a time well prior to the FCC termination date of September 2, 1976, Star sold and assigned substantially all the assets of WIFE–AM to Indianapolis Broadcasting, Inc.[3] These assets included the facilities and equipment located on Tract 2 and those easements and rights contained in the Grant of Easements and Rights directly involved in the WIFE–AM radio operations. Since March 10, 1976, Indianapolis Broadcasting, Inc., has maintained its AM equipment and facilities on Tract 2 and has used such equipment and facilities in connection with radio operations. Neither Star nor Indianapolis Broadcasting, Inc., consulted or notified IBC of the sale and transfer of the WIFE–AM assets until sometime after the sale had occurred. Neither Star nor Indianapolis Broadcasting, Inc., gave IBC notice of the intended assignment of Star's AM easement rights.

In October of 1976, IBC directed a letter to Star which stated that because Star had lost its FCC license to broadcast, paragraphs 3(j) and 3(k) of the Grant of Easements and Rights became operative to terminate the easement. IBC asserted that Star could not assign the valuable FM easement rights and that renegotiation and new

---

1. After an unsuccessful appeal by Star to the United States Court of Appeals for the District of Columbia, the FCC action was to be put in effect at 12:01 A.M., Indianapolis time, on September 2, 1976. Star sought by separate petitions to continue temporarily WIFE–FM beyond September 2, 1976, until a new and different interim licensee could be approved by the FCC. The FCC denied these petitions.

2. Appellee Star argues that the loss of such FCC licenses did not prevent Star from retaining ownership of its equipment, from maintaining such equipment in operational readiness, or from engaging in active negotiations for the sale or lease of its valuable easement rights, as guaranteed by Section 4 of the Grant of Easements and Rights.

3. The transfer of Star's WIFE–AM assets occurred after the purchaser, Indianapolis Broadcasting, Inc., had acquired full operating authority from the FCC to operate as WIFE–AM on the AM radio channel occupied by Star.

additional rent would be required if Star wished to retain its FM easement rights.

At this time Star was actively involved in negotiations with numerous individuals with respect to the sale of the physical assets and easement rights of Star's FM facility.[4] Of course, IBC's position constituted a real and immediate threat to the ongoing negotiations between Star and the various interested parties. This prompted the initiation by Star of the declaratory judgment action from which this appeal is taken.

After a trial without a jury, the trial court held, in part, that:

19. Under the terms of the Purchase Agreement and Grant of Easements and Rights, and as a matter of law, the loss of Star's Federal Communications Commission license did not terminate the grant of easements and rights with respect to the issues here in controversy, and Star is still the owner of such easements and rights.

20. Star has not abandoned the grant of easements and rights and has continued to utilize Tract 2 "for the location of equipment or facilities directly involved in radio broadcast transmission purposes".

Appellant-defendant, IBC appeals from the trial court's construction of the agreement, that being an adverse judgment wherein the trial court found that the easement had not terminated.

The parties do not appear to be in disagreement about the meaning of paragraph 3(k). It is treated by the parties and trial court as an abandonment clause and no such abandonment was argued or found by the trial court.

■ The issue concerns the proper construction to be given to paragraph 3(j) in the granting instrument. The language of paragraph 3(j), which includes the words "so long as" establishes that the easement was intended to be a qualified easement determinable upon the happening of a particular event. An easement may be determinable. *GTA v. Shell Oil Co.,* (1977) Ind. App., 358 N.E.2d 750; *Erie-Haven, Inc. v. First Church of Christ,* (1973) 155 Ind.App. 283, 292 N.E.2d 837. Paragraph 3(j) also has a limiting proviso. If not otherwise extinguished, the easement is not to last longer than forty years. Forty years has not elapsed, therefore that portion of paragraph 3(j) has not caused the easement to terminate.

■ The issue thus becomes the proper construction to be given to the limiting language of paragraph 3(j) of the instrument creating the easement, i. e. "shall continue so long as necessary to the respective transmission operations of the Grantee and the television broadcast operations of the Grantor." "The nature, extent and duration of an easement created by an express agreement or grant must be determined by the provisions of the instrument creating the easement." *Erie-Haven, Inc. v. First Church of Christ, supra.* "It is the duty of the court, in construing instruments creating easements, to discover and give effect to the intention of the parties." *GTA v. Shell Oil Co., supra* at 752; *Brown v. Heidersbach,* (1977) Ind.App., 360 N.E.2d 614; *L. & G. Realty & Construction Co. v. City of Indianapolis,* (1957) 127 Ind.App. 315, 139 N.E.2d 580. If possible, meaning must be given to all parts of the agreement and still remain consistent with the other parts of the agreement. *See Woodruff v. Wilson Oil Co.,* (1978) Ind.App., 382 N.E.2d 1009.

The trial court could have construed[5] the agreement by one of two processes. First,

4. Of those negotiating with Star, some had made application to the FCC for a permanent license, while others applied for an interim or interim and permanent license. Some of these parties indicated that they desired to use the rights and assets in question.

5. There is an abstract distinction between "construction" and "interpretation," in that "construction" is the drawing of conclusions from elements known from, given in, and indicated by, the language used, while "interpretation" is the art of finding the true sense of the language itself, or of any form of words or symbols. In other words, "interpretation" is used with respect to language or symbols themselves, while "construction" is used to determine, not the sense of the words or symbols,

the court could have construed the agreement as a matter of law as if there was no factual issue or ambiguity to be resolved. The other process would have the trial court determine that an ambiguity existed as a matter of law, resolve the ambiguity as a question of fact admitting extrinsic evidence and then construction of the agreement as a matter of law.

Ordinarily, the meaning of words, and the grammatical construction of the English language, so far as they are established by the rules and usages of the language, are *prima facie* matter of law to be construed and passed upon by the court. But language may be ambiguous, and used in different senses, or general words in particular trades and branches of business may be used in a new, peculiar or technical sense, and therefore, in some instances, evidence may be received from those who are conversant with such branch of business, and such technical or peculiar use of language, to explain and illustrate it. If the question arises from the obscurity of the writing itself, it is determined by the court alone; but questions of custom, usage, and actual intention and meaning derived therefrom, are for the jury. [Citations omitted; emphasis original.]

*Prather v. Ross*, (1861) 17 Ind. 495 (overruled on other grounds at *Second National Bank of Akron v. Midland Steel Co.*, 155 Ind. 581, 58 N.E. 833). *See also Wilson v. Kauffman*, (1973) 156 Ind.App. 307, 296 N.E.2d 432. In *Wilson, supra*, 296 N.E.2d at 437 the Court of Appeals elaborated further on the processes of construction.

As a general rule the interpretation, construction or legal effect of a contract is a question to be determined by the court as a matter of law. *U.S.F. & G. v. Baugh*, 146 Ind.App. 583, 257 N.E.2d 699 (1970). However, another equally well accepted rule is that the construction of a contract is for the jury where the terms

but the legal meaning of the entire contract. 17 Am.Jur.2d *Contracts* § 240 (1964).

of a contract are ambiguous and their meaning is to be determined by extrinsic evidence. *Brumfield v. State ex rel. Wallace*, 206 Ind. 647, 190 N.E. 863 (1934); *Modern Woodmen of America v. Hall*, 190 Ind. 493, 130 N.E. 849 (1921); *Reissner v. Oxley*, 80 Ind. 580 (1881). Where a written contract is unambiguous the trial court should construe it and inform the jury as to its meaning. However, if it is ambiguous the particular ambiguity should be selected and submitted to the jury under proper instructions. *Vulcan Iron Works Co. v. Electro Magnetic Gold Mining Co.*, 54 Ind.App. 28, 99 N.E. 429, *reh. den.*, 54 Ind.App. 28, 100 N.E. 307 (1912). Also, when extraneous facts and circumstances are necessary to explain an ambiguous or uncertain contract the question of construction is one of mixed law and fact. *Mobley v. J. S. Rogers Co.*, 68 Ind.App. 308, 119 N.E. 477 (1918). Strictly speaking the interpretation of the contract is not submitted to the jury insofar as the question is one of construction and a question of law, but, the facts on which that construction rests must be determined by the jury. *Portland Body Works v. McCullough Motor Supply Co.*, 72 Ind.App. 216, 119 N.E. 180 (1918). The construction of an ambiguous contract is a question of law where the ambiguity arises by reason of the language used and not because of extrinsic facts. *Prather v. Ross*, 17 Ind. 495 (1861).

The question before the trial court might have been resolved as one of mixed law and fact. As a matter of law, the trial court could have found the language ambiguous or uncertain because of application to extrinsic facts, i. e., the loss of the FCC license. The trial court then may have considered evidence to aid its factual determination of the meaning of the language within the parties' intentions.[6] The trial court could have found that the parties did

6. In this case the parties concede that loss of the FCC license specifically, was not considered in drafting.

not clearly establish a limitation.[7] *A qualification in the nature of a limitation, which would terminate an easement must be clearly established.*[8] *See GTA v. Shell Oil Co., supra* at 753. Therefore the easement did not terminate.

■ We can review only the sufficiency of the evidence to support the judgment of the trial court's factual determination of whether it was clearly established. We also must affirm if the judgment can be sustained on any theory applicable to the evidence. *Cressy v. Shannon Continental Corp.,* (1978) Ind.App., 378 N.E.2d 941. The trial court's judgment comes to us clothed with the presumption that it is correct, and the appellant has the burden of establishing error. *Jones v. First National Bank,* (1968) 143 Ind.App. 243, 239 N.E.2d 398; *In re the Estate of Meyer,* (1966) 138 Ind.App. 649, 215 N.E.2d 556. This court will indulge in all reasonable presumptions in upholding the judgment of the trial court. *Indiana Department of State Revenue v. Boswell Oil Co.,* (1971) 148 Ind.App. 569, 268 N.E.2d 303; *In re Estate of Pendell,* (1968) 142 Ind.App. 673, 236 N.E.2d 842. When reviewing the sufficiency of the evidence to support the judgment of a trial court this court will neither weigh the evidence nor judge the credibility of witnesses. This court will affirm the judgment of the trial court if supported by sufficient evidence when viewed most favorably to the appellee. *Jos. Schlitz Brewing Co. v. Central Beverage Co.,* (1977) Ind.App., 359 N.E.2d 566.

■ The trial court's finding that the easement did not terminate may be sustained if the parties did not clearly establish that the loss of the FCC license was to terminate the easement. There is sufficient evidence to support this finding. The defendant failed to show clear establishment of the limitation. Consequently the trial court's determination cannot be said to be contrary to the evidence.

The lack of clarity in establishing the termination is demonstrated by the use of the word "necessary" in the clause in issue. "Necessary" does not have an exact meaning. It is flexible and relative; it is an adjective expressing degree. The degree may range from mere convenience to that which is indispensable. *Scott v. Walden,* (1942) 140 Tex. 31, 165 S.W.2d 449, 154 A.L.R. 1 *citing Chicago, I. & L. Ry. v. Baugh,* (1911) 175 Ind. 419, 94 N.E. 571, 573. Here, the word "necessary" could be interpreted to mean a convenience or benefit to Star.

■ The rule of construction that in case of doubt or uncertainty a grant of an easement will ordinarily be construed in favor of the grantee also supports the trial court's judgment. 25 Am.Jur.2d *Easements and Licenses* § 23 (1966). Determining what is necessary is a subjective determination made by the grantee of the reciprocal easements. The necessity or value to the respective operation, used in its broadest sense, is still found to exist by Star. This further supports the judgment of the trial court.

Also since "radio transmission operations" is nowhere defined in the transaction the trial court could reasonably interpret that language to have a broad meaning if such was found to be the intent by the parties. This is reasonable in light of the rest of the agreement and lack of definitions therein.

Once the factual determination (that the qualification is not clearly established) is affirmed, construction by the court as a matter of law becomes obvious. The qualification IBC sought was not clearly established, therefore the easement is not terminated. *GTA v. Shell Oil Co., supra.*

---

7. Extrinsic evidence is not admissible to modify or change a meaning expressed in the document. But, where no meaning is expressed, extrinsic evidence is admissible to explain conditions at the time of drafting which aid the trier of fact in determining the intent of the parties.

8. We note that *GTA v. Shell Oil Co.* involved a continuous use limitation; we are applying the clear establishment rule to any qualification in the nature of a limitation which would cause an easement created by grant to terminate.

The other process by which the trial court may have resolved the construction issue is a matter of law. The trial court, following the rule of law that a qualification which terminates an easement must be clearly established, could logically discover that the clause in issue here did not clearly establish the qualification. Therefore, the easement had not terminated as a matter of law.

Affirmed.

CHIPMAN, P. J., and MILLER, J., concur.