(No. 12509.—Decree affirmed.)
Mary DeCosta, Appellee, *vs.* William Bischer, Jr.,
Appellant.

*Opinion filed April 15, 1919.*

1. Evidence—*when administratrix is competent witness in her
suit to set aside deed of intestate.* Where a father has filed a bill
to set aside his deed to his son, and upon the father's death his
daughter, who is administratrix, is substituted as complainant, the
daughter is a competent witness in her own behalf, as the son is
defending only as grantee.

2. Same—*when a grantee may testify against deposition of a
grantor.* Under the fifth exception to section 2 of the Evidence
act, in a suit begun by a grantor to set aside his deed to his son,
and continued, after the death of the grantor, by his administratrix
as substituted complainant, the grantee may testify in his own be-
half as to matters testified to in a deposition of the grantor.

3. Deeds—*equity will set aside a deed where grantee fails to
carry out consideration of support of grantor.* Where one volun-
tarily conveys all his property in consideration of his support and
maintenance during his life and the grantee afterward refuses to
perform the contract, a court of equity will be justified in presum-
ing a fraudulent intention in the first instance in entering into the
agreement and will grant relief by the rescission of the contract
and the cancellation of the deed.

Appeal from the Circuit Court of Putnam county; the
Hon. Clyde E. Stone, Judge, presiding.

Barnes, Magoon & Black, for appellant.

J. L. Murphy, for appellee.

Mr. Justice Dunn delivered the opinion of the court:

William Bischer, Sr., filed his bill to the October term,
1908, of the circuit court of Putnam county, praying for
the setting aside of a deed made by him to William Bischer,
Jr., on September 5, 1896, and for an accounting. It was
alleged that a part of the land so conveyed had been owned
in common by complainant and his wife, Matilda Bischer,

who died intestate July 4, 1896, and her heirs were made parties defendant to the bill. The complainant having died on January 9, 1909, his death was suggested and Mary DeCosta was substituted as complainant, individually and as administratrix of his estate, and an amended and supplemental bill was filed. A cross-bill was filed by the heirs of Matilda Bischer asking for a partition of the land in which she owned an interest at her death and for an accounting. William Bischer, Jr., answered the bill and cross-bill and has appealed from the decree which set aside the deed.

The bill as finally amended alleged that Matilda Bischer died July 4, 1896, intestate, the owner of an undivided one-half interest in a portion of the lands involved in this suit, the other half interest being owned by William Bischer, Sr., who also owned the rest of the land involved; that it was all used as a single farm and occupied as their homestead by Bischer and his wife before her death and continued to be so used and occupied by Bischer, Sr., afterward; that Bischer had two children,—William Bischer, Jr., by a former marriage, and Mary DeCosta, the child of his wife Matilda; that about September 5, 1896, William Bischer, Jr., intending to acquire title to all of the premises without a valuable consideration and to cheat and defraud his father, proposed to his father that he should make to him a deed conveying all of such real estate, to take effect only at the death of William Bischer, Sr.; that in making such proposition the son falsely represented that the deed would be so worded and drawn that the father would have the right to use and occupy such lands until his death and they would be farmed by the son for the use of the father; that the father could reside in his home as he had been doing, but that at any time before his death, if he should desire to do so, he might have the right to reside with his son and there have the comforts of a home until his death; that in making said proposition the son intended to take all of

the premises, and the avails thereof, without waiting for the death of his father, and to cheat his father out of his home and not to comply with any of the provisions proposed; that the father reposed confidence in his son; that he was a Prussian and could not read the English language, though speaking it a little; that in pursuance of the proposed plan and in reliance upon his son he executed the deed in question on the assurance that it contained provisions as proposed. The deed executed was a warranty deed, conveying all the land owned by his wife as well as himself, fifty-five acres, and containing the following: "The grantor reserves the right to occupy the portion of said premises now occupied by him during the period of his natural life, and the right to a home with the grantee whenever he elects to live with him." The bill further alleged that William Bischer, Jr., took possession of the premises after the execution of the deed, farmed them and never gave any of the proceeds to his father, who was old, feeble and unable to care for himself properly and furnished him with a very meager amount of food and clothing; that the father lived alone in the same house at which he and his wife had lived, until 1903, when at his own request he took up his home with his son, where he lived about two years, being neglected and mistreated by his son's wife and family; that he was old and childish, grew tired of his treatment and desired to go to his daughter's home at Spring Valley, about eight miles distant, but his son refused to take him, and about July 4, 1905, or 1906, his daughter took him to her home for a visit; that afterwards the son refused to take him back and permitted him to live with his daughter and be maintained and supported by her and refused to pay his funeral expenses until suit was brought against him. The answer of William Bischer, Jr., besides denying the fraud, denied the mistreatment alleged.

The decree granted the relief prayed for as to William Bischer, Jr., and also set aside a deed subsequently made

by him to the Spring Valley Coal Company of the coal,
fire-clay and mineral underlying a part of the premises, so
far as such deed concerned the interest of the heirs of
Matilda Bischer.

The deposition of William Bischer, Sr., was taken
through the aid of an interpreter and used on the hearing.
It appears from his deposition that he was eighty-four
years of age September 4, 1908, was born in Prussia, had
lived in the United States fifty years and on the farm more
than thirty years; that no one asked him to give a deed
to his son and he had no understanding with his son before
he signed the deed; that his son agreed to give him a third
part of the crops but gave nothing; that he was not able
to read the English language and no one read the deed to
him; that when the deed was made he was living in the
house on a fifteen-acre tract of the land, and three winters
before testifying he quit living there because the house was
spoiled by the rain leaking through the roof onto the bed-
clothes; that his son got all his money and gave him none
of the proceeds of the farm; that at his son's he was given
an up-stairs room with no heat in it, where at times his
breath froze to his whiskers; that his son took his chickens
and cow and moved his barn from the fifteen-acre tract,
and at his son's house his meals were put on his plate,
alone; that there was no more coffee when he wanted it;
that he was not allowed to smoke in the house except up-
stairs or on the porch; that sometimes he was not called to
breakfast but received his breakfast later; that the stairs
were high and hard for him to go up and down; that he
told his son's wife that he was treated like a dog and she
said he was no better than a dog; that his son's wife once
scolded him with a club in her hand, which he thought she
wished to use on him; that he had his own towel and basin,
and he once used the family basin because it had water in
it and it was hard to pump water and the wife told him
it mustn't happen again,—that he was the dirtiest man she

ever saw and needed his own wash-basin; that he wanted to hang his wash-basin on the wall, but the wife would not permit it because it would scratch the paint off; that he left on the 4th of July, and his son didn't want him back, did not send for him and he was unable to walk back.

It appears from the testimony of other witnesses that shortly prior to July 4, 1906, Mary DeCosta (then Mrs. Connselman) and her husband, with Frank Emmett, his wife and two children, were picking blackberries in the neighborhood of the Bischer home, about four and a half or five miles from Spring Valley, where Mrs. Connselman lived; that Mrs. Connselman went to Bischer's house to see her father; that they started for home about four o'clock, and at the corner of the Bischer farm came upon William Bischer, Sr.; that he looked as if he were crying,—a "childish" old man who said something in German, and his daughter asked Emmett if he would take her father to Spring Valley; that he was helped into the wagon and taken to his daughter's home and thereafter lived with and was fed and clothed by his daughter, who had five children, all living in a house of four rooms, and who eked out the family income by taking in washing; that in the morning after William Bischer died, John Facer, a son of Mrs. DeCosta by a former husband, drove over to the place of William Bischer, Jr., met him at the gate, told him of the death, and Bischer, Jr., said: "You take care of him; he left my house; that is all I have to do with him." The undertaker testified that he attempted to collect his bill from William Bischer, Jr., and was told that Bischer didn't hire him, but after bringing suit he was paid. While living with his son, William Bischer, Sr., sometimes visited his neighbors Miclai, crying and complaining of his treatment, and he went to a neighbor's one winter to board because his sleeping place was too cold. Charles Facer, another son of Mrs. DeCosta, testified that William Bischer, Sr., while living with witness' mother, sent him to William Bischer,

Jr., to get some of his underclothes; that the clothes were refused on the ground that William Bischer, Sr., had a home with his son, but Charles was told to get a paper authorizing him to get the clothes, and he did get a paper at the office of the State's attorney for Bureau county, but upon presentation of it was again refused; that William Bischer, Jr., did not come to the house after his father's death but was at the church and took part in the funeral; that he and his sister, Mrs. DeCosta, were not on friendly terms. Other witnesses testified, over objections, as to conversations with William Bischer, Sr., in which he complained of the treatment which he received while living with his son, but this testimony was hearsay and incompetent.

For the defendant, Mrs. Boyle, who was a school teacher and for a time boarded with William Bischer, Jr., while his father lived there, testified that the father was treated kindly, ate with and was treated as a member of the family, and was warmly clothed. Joseph Gleason, whose wife was a sister of Mrs. Bischer, and Peter Cosgrove, who was a brother of Mrs. Bischer, all living in the same neighborhood, testified to like effect. Catherine, Madeline and Charles Bischer, children of William Bischer, Jr., also testified to the same effect and that he was kept neat and clean. The Bischer family consisted of the mother and father, four girls and two boys. Madeline Bischer, a daughter of William Bischer, Jr., testified that after the deed was made Bischer, Sr., stayed at his own little house on the fifteen acres, about two blocks from his son's home; that there were house and barn yards, pens for stock and a garden, and that during the time he lived alone Mrs. Bischer did his washing and baking; that he moved to his son's house because he had that privilege; that the little house had three rooms and a pantry, and that before he moved the Bischer family got his room ready, whatever was there before was taken out and what he wanted was put in,—stands, tables, rug, chair, pictures, bed, bedding,.

clock and keepsakes, which he brought with him; that the room was nine by eleven, plastered and papered, and kept neat and clean, and his mending was done by Mrs. Bischer; that he never complained of the treatment he received.

Objection is made to the testimony of Mary DeCosta, but she was a competent witness, for her adversary defended as grantee and not in any of the capacities named in section 2 of chapter 51 of the Revised Statutes. (*Seaton v. Lee,* 221 Ill. 282.) Likewise, William Bischer, Jr., was a competent witness in his own behalf as to the matters testified to in the deposition of his father, under the fifth exception to said section 2. Mrs. DeCosta testified that her mother, Matilda Bischer, had been married before she married Bischer and had children by her first husband; that she found out her father had abandoned the old home about two years before he died, and on the blackberrying trip, Sunday, she went to the son's home to see her father and saw him at the fence; that as they were going home they again met him at the school house, and he wanted to go home with her to spend the Fourth; that no one ever came to get him or gave him any clothes; that she had only a little house, owned no other property and used to do washing; that her father was nearly always sick; that in her home she had one room thirteen by fourteen feet and another twelve by thirteen, and she and her six children and her father lived there; that neither William Bischer, Jr., nor any member of his family, ever came to visit her father, and William Bischer, Jr., was there only when the deposition was taken and contributed nothing to his support.

William Bischer, Jr., testified as to the treatment his father received at his home, where he lived for about four and a half years, to the same effect as his other witnesses; that his father did not complain or have cause for complaint of his clothing, food or treatment; that he smoked where and when he pleased; that after his father moved from the old home place the witness tore down what was

left of the house, sold his father's cow for $40 and got the money; that he furnished money to his father when he wanted it and bought most of his groceries for him when he lived alone; that he was not at home when his father left on the visit; that he never sought his father or asked him to return or suggested that he return, though he saw him several times at church in Spring Valley; that he refused, when requested, to send his father's bed to him, but always maintained his room ready for his return and was always ready and willing to furnish him a home should he return.

It is worthy of remark in connection with the testimony of this witness that he did not testify as to the events leading up to the deed in question or the circumstances of its execution. His father had testified that he could not read English, no one read the deed to him, and his son had agreed to give him a third of the proceeds from the farm. By the deed in question the grantor divested himself of his entire means of support and made himself dependent upon his son. The doctrine is established in this State that where one voluntarily conveys all his property in consideration of his support and maintenance during his life and the grantee afterward refuses to perform the contract, a court of equity will be justified in presuming a fraudulent intention in the first instance in entering into it and will grant relief by the rescission of the contract and the cancellation of the deed. (*Oard* v. *Oard,* 59 Ill. 46; *Frazier* v. *Miller,* 16 id. 48; *McClelland* v. *McClelland,* 176 id. 83; *Stebbins* v. *Petty,* 209 id. 291.) In this case, in addition to the undenied testimony of William Bischer, Sr., to the effect that his son had agreed to give him one-third of the proceeds of the real estate, and that he could not read the deed and it was not read to him, it appears that, whether his home with his son was made pleasant or not, when he went away on a visit his son made no suggestion that he return, though he knew his father was living with a large

family in a small house and the distance was too great for the old man to walk back. The son failed to visit his father, disclaimed liability for his funeral expenses until sued, and in the meantime kept all the proceeds of the farm. There was a substantial failure on the part of the appellant to keep his agreement in consideration of which the conveyance was made to him, and it was therefore ·properly set aside.

The decree will be affirmed.     *Decree affirmed.*

Mr. JUSTICE STONE took no part in this decision.