EDNA CORNUE *et al.*, Plaintiffs-Appellees, *v.* EDWARD T. WEAVER, Director of the Illinois Department of Public Aid, *et al.*, Defendants-Appellants.

(No. 58933; )

First District (2nd Division)—May 27, 1975.

*Rehearing denied July 22, 1975.*

William J. Scott, Attorney General, of Chicago, for appellants.

Robert A. Simon, of Chicago, for appellees.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

This appeal requires us to decide whether residents of a home for the aged can be denied old age assistance by the Illinois Department of Public Aid solely because they have a written contract which obligates the home to provide them with care and maintenance for life. This question arises from applications for public assistance filed by appellee Edna Cornue and 19 fellow residents of a home for the aged. The applications

were denied; and thereafter, proceeding administratively, they appealed to appellant Edward T. Weaver, Director of the Illinois Department of Public Aid. He appointed a hearing officer who conducted a consolidated appeal hearing, made findings of fact and submitted recommendations that the denials in each case be upheld. Appellant confirmed the recommendations.

Thereafter, appellees filed suit for administrative review. The trial court, pursuant to statute, reviewed the record, received briefs, heard the parties, and found that the administrative decisions were against the manifest weight of the evidence and contrary to law. It ordered reversals in each case. Then, in a later clarifying order, the court directed that payments of old age assistance benefits were to be retroactive to the date when each application was made.

## I.

Between October 21, 1952, and November 1, 1962, Edna Cornue, Ella F. Hayen, Wilhelm Baeselsoeder, Hattie Eggert, Martha Engbrecht, Katherine Fischer, Theresa Goetz, Frieda Hausen, Emma Helmig, Marie Klahs, Martha Klein, Sophie Koch, Adam Kurth, Theresa Lehmann, Bertha Meyer, Bertha Page, Rose Stetina, Helen Walters, Anna Weissman and Wilhelmine Zeigler, became residents of the Altenheim German Old People's Home, a not-for-profit licensed shelter and nursing facility in Forest Park, Illinois, that was organized in 1885 to care for aged needy Germans of both sexes. At the time of the decision in these cases, the physical accomodations of the home consisted of a seven-building complex, the oldest one constructed in 1886. It operated on a fiscal year that ended on April 30; and its books were audited annually. Internally, the home was governed by rules adopted by its Executive Board. When it accepted appellees as residents, a contract of admission was executed which provided that "[i]n consideration of the obligation herein assumed by the above named [incoming resident] the * * * Altenheim (German Old People's Home) of Chicago, Illinois, hereby agrees and obligates itself to admit the said Applicant as an inmate * * * for and during the period of said Applicant's life; to provide [him or her] during the period of [his or her] sojourn therein with a comfortable and sanitary home, good food, necessary clothing, entertainment, reading matter, medical treatment, attention and nursing, and on [his or her] demise a decent burial." Edna Cornue and the other 19 appellees each signed such a contract. They paid the home money in amounts that ranged from $1500 to $3000 and agreed to convey or deliver "* * * as its absolute property, all property and estate, both real and personal (including goods, money, securities and credits), of which said applicant is owner or possessor, or which may

come to [him or her] in the future * * *." On behalf of each, a ledger account was opened and the money or property paid or delivered was credited; thereafter, a debit was entered each year for his or her cost of care and maintenance.

In 1952, when the first of the contracts was executed, the home had 274 residents and 8 employees. In 1971, when the applications for old age assistance were filed, it had 197 residents and 114 employees. One hundred and nineteen residents had lifetime care contracts; 78 did not. Despite this difference, both classes of residents have always been treated as having identical rights to continued care and maintenance. In 1952, the home's cost of care per resident was $712 per year. In 1971, it was $5300, an increase of almost 750%. Before 1967, residents who could were required to do light work. After that year, work has not been required of any resident.

In 1966, the Cook County Department of Health required the home to make substantial changes in its physical facilities, including the construction of a new infirmary which cost $995,000. The construction increased the cost of operating the home because it made a larger staff necessary and added to the general administration expenses. While in 1965 the operating loss of the home was $3500, in 1968 was $260,000. The operating loss continued to increase: $251,463 in 1969; $424,168 in 1970 and $412,290 in 1971. Since 1966, to meet operating expenses, the home was compelled to sell securities from its investment portfolio. As a consequence, the home's investments were reduced in value from $968,616 to $600,000. Although there is no immediate plan to repudiate the life-care contracts, and every resident is being cared for, once this sum is used to meet operating expenses, the home will have to close its doors. It has no religious or fraternal affiliation on which to draw for support.

As to each appellee, at the time he or she applied for old age assistance, the cash or property paid to the home had been wholly consumed for his or her care and maintenance. Appellees have no other source of income except, in some instances, social security benefits. Their applications for old age assistance were denied solely because he or she had a life-care contract with the Altenheim German Old People's Home. When appellant, as the Illinois Director of Public Aid, wrote to appellees' counsel telling him that the applications were being denied, he said, "It is our view that the contracts in question are life-care contracts; that the parties to the contracts, at the signing of the contracts are held, by law, to have contemplated the possibility of changing circumstances as to either party and to have entered into these contracts for the purpose of protecting themselves against future contingencies. The legislature did not, in the

enactment of Article III, Section 3—1.5 of the Illinois Public Aid Code abrogate the law of contracts."

## II.

Article III, section 3—1.5 of the Illinois Public Aid Code on which appellant rested his decisions and on which appellees rely for support of the trial court ruling in their favor, provides that "[p]ersons who are residents of or who are being maintained by a private institution may qualify [for public assistance] only if they have not purchased care and maintenance in the institution by cash or by transfer of property, or having purchased care and maintenance, only after the amount of the cash or property has been wholly consumed for care and maintenance." (Ill. Rev. Stat. 1971, ch. 23, par. 3—1.5.) By rules and regulations, and acting through those he appoints, appellant enforces the provisions of this section. (Ill. Rev. Stat. 1971, ch. 23, pars. 12—1, 12—4 through 4.24.) Accordingly, and under authority of his office, the Illinois Department of Public Aid adopted Rule 8.02.2 which states that "[a] resident who has an agreement for life-care with the private institution by virtue of a written or oral contract or agreement, or of provisions stated in the institution's Articles of Incorporation, bylaws, or other official documents or publications, shall be considered not in need of public assistance on the basis that he has a resource to meet his needs." The department's Categorical Assistance Manual, chapter 550, topic 555.1, provides, in part, that "If the applicant for public assistance has a life care contract with the home, he is not in financial need and therefore is not eligible for assistance * * *. [A]ny and all contracts or agreements between a resident and the home constitute a tangible asset * * *. The Commission does not recognize a revision in or abrogation of an original contract * * *." In the same chapter, administrative personnel are furnished with a detailed discussion of life-care agreements involving residents in homes for the aged. The discourse concludes with the statement that "[a] feature which obviously distinguishes a contract which does not provide for care is a statement that the applicant for admission to the home agrees to pay at a monthly rate for his care, or agrees that after the value of the assets he turns over to the home has been exhausted, he will apply for public assistance."

The Illinois Department of Public Aid is the agency which administers the Illinois Public Aid Code in order "* * * to assist in the alleviation and prevention of poverty and thereby to protect and promote the health and welfare of all of the people of this State." (Ill. Rev. Stat. 1971, ch. 23, par. 1—1.) Its jurisdiction as an administrative agency is deter-

mined from the powers granted it by the legislature. (*Waupoose v. Kusper*, 8 Ill.App.3d 668, 290 N.E.2d 903.) An examination of the code shows a broad delegation of authority. Consequently, the department can do all that is reasonably necessary to execute its powers and perform its statutory duties. (Compare *A. E. Staley Manufacturing Co. v. Environmental Protection Agency*, 8 Ill.App.3d 1018, 290 N.E.2d 892.) For example, it can construe statutes and court decisions to the extent necessary for determination of issues which it has authority to resolve. (*Sugden v. Department of Public Welfare*, 20 Ill.2d 119, 169 N.E.2d 248.) Of course, as is true of administrative agencies generally, it can not perform inherent judicial functions. However, where direct or immediate judicial action is inexpedient or impractical, it has quasi-judicial power as an administrative agency. (*Ford v. Environmental Protection Agency*, 9 Ill.App.3d 711, 292 N.E.2d 540.) In these cases, the department was required to determine appellees' need for old age assistance. (Ill. Rev. Stat. 1971, ch. 23, par. 3—1.2.) A life-care contract between them and the home in which they lived could affect such a determination. This is so because an aged person's entitlement or right to demand care and maintenance from a home is prima facie evidence of lack of need. (See *Reynolds v. State of Illinois*, 26 Ill.App.3d 933, 326 N.E.2d 109.) Resort to judicial action is neither expedient nor practical every time the existence of a life-care contract becomes an issue in the case of an applicant for old age assistance. Therefore, when disposition of a case requires a determination, the department has the power, and indeed the duty, to decide whether there exists a life-care contract, and the extent to which it is enforceable. *Beam v. Erven*, 133 Ill.App.2d 193, 272 N.E.2d 685.

In fact, the department's rules and regulations, the instructions to subordinates contained in its Categorical Assistance Manual, reflect recognition of the power delegated by the legislature. The decisions which the trial court reversed show a discharge of the duty. When appellees' applications for public assistance were submitted, the life-care contracts in question were analyzed by legally trained personnel who studied the agreements, decided they were enforceable and recommended that appellees' requests be denied solely "\* \* \* for the reason [that, in each case] needs are met by life-time contract." Ignored was the fact that ledgers maintained by the home showed the money or property paid was allocated to the care of each contracting resident that, as to each, the cash or property had been wholly consumed for his or her care and maintenance; that the home, because what it had received from appellees did not meet their need, was asking relatives to make supplementary payments of money for the medical care of the 20 who were applying for old age assistance; and, finally, that because of building construction it

was compelled to make by the Cook County Department of Public Health, the home was heading toward closing its doors.

■■ Moreover, these life-care contracts were not free of ambiguity. Some residents had them; others did not. Yet, all enjoyed the same rights to continued care and maintenance. The contracts appear to depend on the payment of a cash amount, an application fee; but the extent of the money paid or delivered, and for what, is ambiguous. It is generally said that where the terms of a contract are ambiguous, and the parties have placed a reasonable construction on them, this interpretation will be adopted by a court that is called upon to construe the contract. (*Chicago Daily News, Inc. v. Kohler*, 360 Ill. 351, 196 N.E. 445; *Berry v. Blackard Construction Co.*, 13 Ill.App.3d 768, 300 N.E.2d 627.) Here, the parties construed the life-care contracts as ones under which the money or property paid was allocable to the care and maintenance of the contracting resident. This, in view of the contractual relation usually created between a home for the aged and a resident, is a reasonable construction. It comports with the language used by the legislature when it adopted section 3—1.5. (See Ill. Rev. Stat. 1971, ch. 23, par. 3—1.5.) Therefore, if appellees were to sue the Altenheim German Old People's Home for specific performance of their respective life-care contracts, a judgment would be entered against them because evidence available to the home would prove that appellees were the objects of continued charity rather than owners of enforceable contract rights. One who is the object of charity is not disqualified to receive old age assistance from the State. (*People ex rel. Freeman v. Department of Public Welfare*, 368 Ill. 505, 14 N.E.2d 642; compare *Moore v. State Social Security Com.* (1938), 233 Mo.App. 536, 122 S.W.2d 391; *In re Application of Rasmussen* (1940), 207 Minn. 28, 289 N.W. 773; *In re Application of Van Marter* (1942), 263 App.Div. 498, 33 N.Y.S.2d 677, *aff'd* (1942), 288 N.Y. 729, 43 N.E.2d 351.) In fact, these applicants for public assistance are precisely within the class of persons residing in a private institution who would "* * * qualify only if they have not purchased care and maintenance in the institution by cash or by transfer of property, or having purchased care and maintenance, only after the amount of the cash or property has been wholly consumed for care and maintenance." Ill. Rev. Stat. 1971, ch. 23, par. 3—1.5; compare *Reynolds v. State of Illinois*, 26 Ill.App.3d 933, 326 N.E.2d 109.

Appellant, however, argues that this construction of section 3—1.5 would cause Illinois to violate Federal statutes that govern qualifications which States must meet if they are to receive Federal funds for old age assistance. In support of this argument, he refers to the statute and to general decisions from other jurisdictions. In addition, appellant argues that this construction would violate State and Federal constitutional pro-

visions which forbid impairment of contracts. He insists the construction will result in a subsidy of the Altenheim German Old People's Home in violation of the fourteenth amendment to the United States Constitution, article I, section 2, of the 1970 Illinois Constitution, and those provisions of our law which mandate that public funds be used only for public purposes. This subsidy, appellant tells us, will create an evil: the practice of private institutions attracting aged residents by promising life-care contracts which would enable them to amass fortunes by carefully following actuarial longevity calculations. Appellant foresees a home for the aged advertising life-care contracts in exchange for present and future assets of applicants knowing that some would die sooner than others, to the immense profit of the private institutions.

We have examined the Federal statute, the cases cited, the constitutional provisions called to our attention, and all of appellant's arguments. It is obvious that the Federal law requires a State, through its delegated agency, to determine need for old age assistance by taking into consideration other income of the applicant or any resource which he may have. In our judgment, application of section 3—1.5, as construed, to a request for old age assistance, complies with these requirements. Therefore, the cases cited do not apply to the issue before us. Plainly, the constitutional provisions to which appellant refers are not infringed by what is being done in these cases. For all of these reasons, we are constrained to conclude that there is no merit to appellant's arguments.

Appellees have no other income; the contracts they have with their home, as they have lived under them, are not resources; all the cash or property paid to the home has been wholly consumed for his or her care and maintenance; and the applications for public assistance were by them, personally, for their use and benefit. These facts satisfy us, as they did the trial court, that granting old age assistance to appellees is not a subsidy to the Altenheim German Old People's Home.

■■ Further, we are not persuaded that the construction we have placed on section 3—1.5 will result in the evil appellant envisions. But if it does, we believe that those who administer the Illinois Public Aid Code have adequate means with which to deal with problems of the kind described by appellant. In any event, denying old age assistance to otherwise qualified applicants certainly is not a legally acceptable policy. In fact, appellant's arguments, were they to prevail, would defeat the primary purpose of the code. Poverty that now characterizes the condition of 20 Altenheim residents, instead of being alleviated and prevented, would spread to include the home itself and all those who now live there. It is not disputed that the present plight of this private institution is directly related to governmental decision of Cook County authorities; nor is it

disputed that if this home has to continue the care and maintenance of appellees it will be compelled to close its doors in the near future. All this will come about only because appellant has concluded, to the exclusion of other material facts, that appellees have enforceable life-care contracts with the home in which they live. We agree with the trial court that this result would conflict with the Illinois Public Aid Code. Accordingly, we conclude that under the circumstances of these cases, appellees as residents of a home for the aged cannot be denied old age assistance solely because each has a written contract which, on its face, obligates the home to provide him or her with care and maintenance for life. They qualify for old age assistance, and their benefits are retroactive to the date when they applied. The trial court had the power to direct appellant to pay appellees their entitlements retroactive to the dates of the respective applications. (*Campbell v. Department of Public Aid,* 9 Ill.App.3d 962, 294 N.E.2d 698.)[1] Therefore, the order reversing the administrative decisions, and the one making the payments retroactive, are affirmed.

Affirmed.

DOWNING, P. J., and HAYES, J., concur.

---

[1] *Campbell,* a case decided by another division of this court, is pending in the Supreme Court of Illinois on the advisement docket awaiting decision. Absent compelling differences of controlling precedent to the contrary, the decision of another appellate division should be followed. (Compare *Corbett v. Devon Bank,* 12 Ill.App.3d 559, 299 N.E.2d 521; *Parker v. Parker,* 335 Ill.App. 293, 81 N.E.2d 745; *Hughes v. Bandy,* 336 Ill.App. 472, 84 N.E.2d 664, *aff'd* 404 Ill. 74, 87 N.E.2d 855.) Appellant's argument concerning the trial court's power to make the benefits to appellees retroactive is extensive and detailed; but it overlooks *Campbell,* a case which holds that the trial court can make old age assistance payments retroactive.