(No. 47821.—

EDNA CORNUE *et al.*, Appellees, v. THE DEPARTMENT OF PUBLIC AID *et al.*, Appellants.

*Opinion filed June 28, 1976.—Rehearing denied Sept. 30, 1976.*

CREBS, J., dissenting.

William J. Scott, Attorney General, of Chicago (John D. Whitenack, Assistant Attorney General, of counsel), for appellants.

Robert A. Simon, of Chicago, for appellees.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

The plaintiffs in this case are 20 elderly persons, each of whom entered into a contract with Deutsches Altenheim (German Old People's Home), a not-for-profit corporation organized in 1885 to maintain a home for aged Germans in needy circumstances. The terms of each

contract provided that the plaintiff (designated as applicant) conveyed to the Home:

"*** all property and estate, both real and personal (including goods, money, securities and credits), of which said applicant is owner or possessor, or which may come to her [him] in the future, including annuities and pensions, and in case they are not assignable, the applicant agrees to deliver up the moneys as received ***."

In consideration for the transfer to the Home of all of the plaintiff's present and future assets the Home agreed to:

"*** admit the said applicant as an inmate of said DEUTSCHES ALTENHEIM for and during the period of said applicant's life; to provide her during the period of her sojourn therein with a comfortable and sanitary home, good food, necessary clothing, entertainment, reading matter, medical treatment, attention and nursing and, on her demise, a decent burial."

During 1971 each of the plaintiffs applied for public assistance. Those applications were denied by the Cook County Public Welfare Department on the ground that the needs of the applicants were met by their contracts for lifetime care. After a hearing the Illinois Department of Public Aid affirmed the ruling of the county department. On administrative review the circuit court of Cook County held that the plaintiffs were eligible for public assistance, and directed that payments be made retroactively to each plaintiff to the date of the application for assistance. The Appellate Court, First District, affirmed. (29 Ill. App. 3d 546.) Because this result conflicts with the earlier decision of the appellate court in *Reynolds v. Department of Public Aid* (1975), 26 Ill. App. 3d 933, we granted leave to appeal.

The Public Aid Code contains the following relevant provisions concerning the eligibility of an applicant for financial assistance:

"Income available to the person, when added to contributions in money, substance, or services from other sources, including contributions from legally responsible

relatives, must be insufficient to meet the person's basic maintenance needs as defined by standards established by the Illinois Department." Ill. Rev. Stat. 1971, ch. 23, par. 3–1.2.

"Persons who are residents of or who are being maintained by a private institution may qualify only if they have not purchased care and maintenance in the institution by cash or by transfer of property, or having purchased care and maintenance, only after the amount of the cash or property has been wholly consumed for care and maintenance." (Ill. Rev. Stat. 1971, ch. 23, par. 3–1.5.)

The rules of the Illinois Department of Public Aid state:

"A resident who has an agreement for life-care with the private institution by virtue of a written or oral contract or agreement, or of provisions stated in the institution's Articles of Incorporation, by-laws, or other official documents or publications, shall be considered not in need of public assistance on the basis that he has a resource to meet his needs." Rules & Regulations Ill. Dept. of Public Aid, Art. 8, Rule 8.02.02.

The validity of this rule was attacked in *Reynolds v. Department of Public Aid* (1975), 26 Ill. App. 3d 933, and it was there sustained upon the following grounds:

"*** In some instances where one pays for care and maintenance the cost may be properly allocable to the amount of care and maintenance purchased, either in terms of the nature and quantity of the goods and services, or the period of time during which the care and maintenance is furnished. Here, however, no such allocation can be made until the recipient has died. The contract or agreement is for life, and the assets, although they may be actually considered as consumed by the Home by its costs prior to death, are properly allocable from the date or [*sic*] transfer over the entire remaining span of the recipient's lifetime. The contract is a gamble of sorts. The Home or other institution furnishing the care under a non-

allocable life care contract may lose or gain financially, depending upon such factors as its cost for the care furnished, the value of the assets transferred, and the life span of the recipient. Under such agreement the recipient may likewise benefit or sustain a financial loss, depending upon many of the same factors. *** In light of the stated purpose of the Illinois Public Aid Code, an unqualified life-care contract or agreement which entitles the aged person to continued care and maintenance, even after the value of the assets transferred may have been exhausted, does not come within the exception of section 3—1.5 of the Code." 26 Ill. App. 3d at 939.

These views are in accord with the principles applied to contracts of this type, which were thus stated in *Corzine v. Keith* (1943), 384 Ill. 435, 441:

"The law is uniformly established in this State that where one voluntarily conveys his property in consideration of support and maintenance during his life, and the grantee afterwards refuses or neglects to perform the contract a court of equity will grant relief by setting aside the deed and reinvesting the grantor with title. (*Fabrice v. Von der Brelie,* 190 Ill. 460; *Luttrell v. Wyatt,* 305 Ill. 274.) The court will infer, from the grantee's refusal to perform, a fraudulent intent in the first instance in entering into the agreement and grant a rescission on the ground of such fraudulent intention. (*DeCosta v. Bischer,* 287 Ill. 598; *O'Ferrall v. O'Ferrall,* 276 Ill. 132; *Cumby v. Cumby,* 240 Ill. 235; *Mruk v. Mruk,* 379 Ill. 394; *Didiuk v. Karpuk,* 348 Ill. 98, and many other cases.) Partial support by the grantee is not a sufficient performance of an agreement to support. (*O'Ferrall v. O'Ferrall,* 276 Ill. 132; *DeCosta v. Bischer,* 287 Ill. 598.)" See also

*Bradecich v. Rivard* (1952), 411 Ill. 214; *Sisters of Third Order of St. Francis v. Estate of Guillaume* (1921), 222 Ill. App. 543; 15 Am. Jur. 2d Charities, sec. 151.

The opinion of the appellate court in the present case neither disputes nor discusses the ground upon which the Department's regulation was sustained in the *Reynolds* case. It appears rather to have based its contrary conclusion upon circumstances which were thought to be peculiar to this case, and thus to render the ordinary rules inapplicable. We therefore turn to those circumstances.

When this case was before the Department in 1971, there were 197 residents in the Home, of whom 119 had life care contracts like those of the 20 plaintiffs involved in this case. Seventy-eight residents did not have such contracts. It was stipulated that the Home had expended more funds in caring for each of the 20 plaintiffs than it had received from that plaintiff. Over the years since 1952, when the first of the 20 life care contracts here involved was entered into, the cost of care has very greatly increased. In 1952 the Home had 274 residents and 8 employees. At that time those residents who could do light work were required to do so. In 1967 this requirement was eliminated. The Home now has 197 residents and 114 employees. The Home employs two physicians whose services are available to residents without cost. Most of the cost of hospital care and medication is paid by Medicare; the Home attempts to recover any portion not so paid from relatives of the residents.

The increase in the number of employees is attributed in large part to the construction of a new infirmary which was opened in 1967. The circumstances that occurred in 1966 which gave rise to construction of the infirmary were thus described by the president of the Home:

"We had inspections by the Department of Health and they sent us about a five-page single space letter of the requirements that were necessary for us to operate the Home, where if we did not respond to it they would be

compelled to close us up and among many things that they required was a new infirmary; that the buildings that we had there, at the time, did not comply with the regulations as stipulated in the rules and regulations of the Department of Public Health. That the corridors were not wide enough; the doors were not wide enough to permit wheelchair patients to come in and out.

In that event we built a new infirmary. This cost us $1,000,000 minus equipment. That necessitated us dipping into our endowment or our reserve funds, which was about one million and a half at that time, which has now been reduced to half of that sum."

It is the construction of the new infirmary that is primarily relied upon to set this case apart from the host of others in which efforts to avoid the obligations of life care contracts have been repudiated. The net value of the new infirmary and its equipment, after depreciation, was $1,433,000 in 1971 when the hearing took place. While the construction of the new infirmary greatly increased the value of the physical assets of the Home, its construction necessitated the sale of securities and the hiring of many more employees. The record shows that the operating losses of the Home were $251,000 in 1969, $424,000 in 1970, and $412,000 in 1971. The record does not show how assets received under life care contracts from residents and from new applicants for admission are treated upon the books of the Home.

We find no ambiguity on the face of the contracts between the Home and its residents, and ambiguity is not created by the circumstance that the Home has adopted the same policy with respect to expelling a resident whether or not he has a life care contract. The Home seeks to avoid its obligations under the 20 life care contracts involved in this case on the ground that those contracts "have become impossible to perform because of orders issued by the Department of Health of Cook County requiring the Home to build the new infirmary." The role of the county was, however, as a matter of law confined to the enforcement of health and safety requirements.

Whether to build a new infirmary, and if so, the amount of money to be spent in building and equipping it were decisions made by the Home, not by the county.

Whether the Home will be compelled by increasing costs to close its doors at some future date depends upon many factors—among them the value of the assets that will come to it under past and future contracts for lifetime care.

The judgments of the circuit and appellate courts are reversed, and the cause is remanded to the circuit court of Cook County with directions to affirm the decision of the Illinois Department of Public Aid.

*Reversed and remanded,*
*with directions.*

MR. JUSTICE CREBS, dissenting:

I dissent for the reasons stated in the opinion of the appellate court. 29 Ill. App. 3d 546.